## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| **STEVEN A. ARMATAS, ESQ.,**<br>Individually, and | CASE NO: |
| **THE ESTATE OF<br> ALEXANDER E. ARMATAS,**<br>Steven A. Armatas, Executor<br>7690 Bucknell Circle N.W.<br>North Canton, Ohio 44720 | JUDGE: |

)
)
)
)
)
)
)
)
)
)

*PLAINTIFFS,*

*vs.*

**THE HON. CHRYSSA N. HARTNETT**,
in her Individual Capacity as to Counts 1
through 5; and in her Official Capacity as a
Stark County Court of Common Pleas Judge
as to Count 6;
c/o Stark County Court of Common Pleas
115 Central Plaza North, Suite 320
Canton, Ohio 44702

-and-

**LOUIS P. GIAVASIS**, in his official
capacity as **STARK COUNTY
CLERK OF COURTS,** as to Count 6;
c/o Stark County Court of Common Pleas
115 Central Plaza North, Suite 320
Canton, Ohio 44702,

*DEFENDANTS.*

**CIVIL COMPLAINT FOR:**

1. **42 U.S.C. §1983---
   Violation of Procedural
   Due Process;**

2. **42 U.S.C. §1983----
   Violation of the
   Equal Protection  Clause**

3. **Defamation;**

4. **Interference with Business
   Relations;**

5. **Invasion of Privacy; and**

6. **Action for Declaratory
   Judgment**

**DEMAND FOR JURY TRIAL**

**NOW COME PLAINTIFFS**, STEVEN A. ARMATAS, Individually, and as the duly appointed Executor of the Estate of ALEXANDER E. ARMATAS, deceased (collectively, for ease of reference, the "Plaintiff"), by and through undersigned counsel, and for their Civil Complaint state as follows:

<u>**INTRODUCTION**</u>

1.      In his 35 years of practice as a lawyer, Plaintiff has never been more pained in having to file a complaint against anyone. Judge Hartnett is a fine jurist and a respected and valued member of our community. Judge Hartnett has admirably spent her entire career as a public servant, first as a top-flight prosecutor, and now as a Judge on the Stark County Court of Common Pleas. In his legal dealings with Judge Hartnett, Plaintiff has always found her to be cordial, prepared, and exceedingly professional. However, sometimes, even the best of people can do things which improperly hurt others.

2.      In this particular case, Judge Hartnett, after dismissing Steven A. Armatas, the individual, as a party in a case before her, and lacking subject matter jurisdiction over the issue in question, found Attorney Armatas to have violated his duties as a Notary Public by notarizing his own father's signature on a power of attorney form on December 11, 2011.

3.      At the time of her ruling, Judge Hartnett no longer had any personal jurisdiction over Mr. Armatas, and clearly acted outside the scope her authority and the Trial Court's subject matter jurisdiction by choosing to opine on an alleged "notarial infraction," supposedly committed by Steven A. Armatas, when all such matters fall exclusively under the auspices and domain of the Ohio Secretary of State.

4.      Judge Hartnett then used such alleged notarial infraction as the sole reason to dismiss Plaintiff's lawsuit against the Cleveland Clinic Foundation on summary judgment, which

2

lawsuit had been filed in the Stark County Court of Common Pleas and assigned to Judge

Hartnett on November 6, 2018, and designated as Case No. 2018-CV-02163   (the "Underlying

Litigation"). The original complaint filed in the Underlying Litigation (the "Complaint") is

attached hereto as **Exhibit #1.**

5.      However, the dismissal of the Underlying Litigation on summary judgment is not

the reason Plaintiff comes before the Federal District Court today. Rather, Plaintiff is here

because Judge Hartnett has violated Plaintiff's civil rights and caused him to incur damages.

Judge Hartnett did so by publicly and irresponsibly labeling Plaintiff as a violator of the Ohio

Notarial Code of Conduct, at a time when she lacked both personal jurisdiction over him and

subject matter jurisdiction regarding such issue.

6.      Such labeling has besmirched Plaintiff's character, reputation and integrity. It has

cost him business as an attorney, forced him to incur expenses to defend his name, and could

potentially impair his ability to serve as a notary and/or practice law in the State of Ohio.  While

no action has been taken, or even threatened, against Plaintiff by any administrative authority

regarding his supposed "misconduct," the longer such undeserved stain remains on his record,

the more harm he suffers.

7.      Plaintiff does not come before this Federal Court because he disagrees with Judge

Hartnett's legal reasoning. He comes before this Court because Judge Hartnett has caused him to

incur significant damages by acting outside her authority as a judge.

8.      Plaintiff is well aware judges enjoy immunity from damages even for making bad,

poorly-reasoned, illogical, and/or biased decisions.  "It is a well-entrenched principle in our

system of jurisprudence that judges are generally absolutely immune from civil suits for money

damages." *Barnes v. Winchell,* 105 F.3d 1111, 1115 (6th Cir.1997) (citing, *inter alia, Mireles v.*

3

*Waco,* 502 U.S. 9, 9, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991); *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 351, 20 L.Ed. 646 (1872)).

9.     The key word from *Barnes*; however is "generally," because exceptions do exist. It has long been recognized that judicial immunity can be forfeited in two instances. "First, a judge is not immune from liability for non-judicial actions, *i.e.,* actions not taken in the judge's judicial capacity. Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Mireles,* 502 U.S. at 11-12, 112 S.Ct. 286 (internal citations omitted).

10.     It is also black letter law that the judicial officer, as "[t]he proponent of a claim to absolute immunity[,] bears the burden of establishing the justification for such immunity." *Antoine v. Byers & Anderson, Inc.,* 508 U.S. 429, 432, 113 S.Ct. 2167, 124 L.Ed.2d 391 (1993); see also *Cooper v. Parrish,* 203 F.3d 937, 944 (6th Cir. 2000). Thus, it is Judge Hartnett's burden to establish that her actions are immune from prosecution.

## PARTIES

11.     Plaintiff, Steven A. Armatas, is an individual residing at 7690 Bucknell Circle N.W., North Canton, Ohio 44720, which is located in Stark County, Ohio, and serves as the Executor of the Estate of Plaintiff's Decedent, Alexander E. Armatas (hereinafter, sometimes, "Alexander"), as duly appointed by the Stark County Probate Court on December 15 , 2016, in Case No. 227735. Steven A. Armatas is also a practicing attorney in good standing with the Ohio Supreme Court.

12.     At all relevant times herein, Defendant Louis P. Giavasis was and is the duly-elected and serving Clerk of Courts of the Stark County Court of Common Pleas, and is being sued herein solely in his official capacity.

4

13.     At all relevant times herein, Defendant Judge Chryssa N. Hartnett was and is a duly-elected Common Pleas Court Judge serving on the Stark County Court of Common Pleas. Judge Hartnett is being sued herein in her personal capacity on Counts 1 through 5, and in her official capacity on Count 6.

## JURISDICTION AND VENUE

14.     Plaintiff incorporates Paragraphs 1 through 13 above as if fully re-written and re-alleged herein.

15.     The United States District Court for the Northern District of Ohio has jurisdiction over this action pursuant to 28 U.S.C. §1331, and because all actions of the Defendants alleged herein took place within Stark County, Ohio, and Plaintiff's damages are above and beyond the jurisdictional minimum for this Court.

16.     This action is properly venued in the United States District Court for the Northern District of Ohio pursuant to 28 U.S.C.  §1391(b) because (i) Stark County, Ohio lies within the judicial district of this Honorable Court; (ii) Plaintiff lives, works, and conducts his business in Stark County, Ohio; (iii) the Defendants work and conduct their business in Stark County, Ohio; and (iv) all the acts and omissions complained of herein took place in Stark County, Ohio.

## STATEMENT OF FACTS

17.     Plaintiff incorporates Paragraphs 1 through 16 above as if fully re-written and re-alleged herein.

18.     The sole defendant in the Underlying Litigation, the Cleveland Clinic Foundation ("CCF"),  manages and operates an online medical consulting service, known as the MyConsult Clinical Operations Center (hereinafter, "MyConsult").  MyConsult engages in the business of using physicians and other medical professionals employed by CCF to review and analyze the

medical records of individuals who seek second or supplemental medical opinions from the Cleveland Clinic regarding a current diagnosis and/or such conditions, symptoms, illnesses, injuries or maladies as they may be exhibiting. (Complaint, ¶11).

19.    On October 11, 2014, Plaintiff's decedent, Alexander E. Armatas ("Alexander"), suffered a cardiac episode and was taken by ambulance to Aultman Hospital in Canton, Ohio (hereinafter, "Aultman") where he remained in a coma and on a respirator until his passing on December 31, 2014. (Complaint, ¶12).  During the time Alexander was hospitalized, his doctors at Aultman advised Plaintiff herein, Mr. Steven A. Armatas ("Steven"), in his role as Alexander's only child and next of kin, that his father was unlikely to regain consciousness or recover in any meaningful way, and forcefully recommended to Steven on multiple occasions that Alexander be taken off the respirator and permitted to die of natural causes. (Complaint, ¶13).

20.    However, during this same time period, Steven and other family members personally observed continuous improvement in his father's physical condition and strenuously disagreed with the diagnosis and prognosis of the Aultman physicians who were making such recommendations. (Complaint, ¶14).

21.    Facing the most difficult decision of his life and unsure of what to do, on or about December 2, 2014, Steven contacted MyConsult via his personal computer in order to register and seek an "Online Medical Second Opinion," as advertised by the Cleveland Clinic on its website, regarding his father's diagnosis and prognosis as rendered by the Aultman doctors. (Complaint, ¶15).

22.     As part of this same electronic submission, Steven completed two lengthy medical questionnaires which described Alexander's medical condition in detail. (Complaint, ¶16).  On December 4, 2014, Steven received an email notification from MyConsult

acknowledging his request, assigning him reference number 50039, asking that several additional forms be completed and signed, and seeking certain of Alexander's medical records to review so it could render the second medical opinion (hereinafter, the "SMO").   (Complaint, ¶17).

23.     On that same day, December 4, 2014, Steven, using his personal computer, contacted Health Advocate, a Pennsylvania corporation (hereinafter, "HA"), that specializes in the collection and retrieval of medical records, and which had been recommended to him by MyConsult, in order to retain HA's assistance in quickly obtaining Alexander's medical records from Aultman. (Complaint, ¶18).  Steven paid $275.00 for such service directly to CCF on his own credit card and using his own personal funds. (Complaint, ¶19).

24.     On December 10, 2014, Steven sent by First Class U.S. Mail to HA completed and fully executed copies of the following documents:  (i) Cleveland Clinic Proxy Form; (ii) Cleveland Clinic Release of Information over the Internet Form; (iii) Patient Consent Form; (iv) Doctors, Hospitals and Imaging Centers Contact Information; (v) Summary of Diagnosis as prepared by the Plaintiff; (vi) Health Advocate Authorization Form; and (vii) Physician Consent/Consult Form.  (Complaint, ¶20).

25.     The Patient Consent Form, which was attached as an exhibit to the original Complaint filed in the Underlying Litigation, was signed by Steven A. Armatas, in his then capacity as Alexander's duly-appointed power of attorney.  The signature line on which Plaintiff wrote his name contains an asterisk (*) underneath which cross-references to the following statement:

> "If other than patient's signature a copy of legal papers verifying authority (e.g., Power of Attorney or Death Certificate) MUST accompany the authorization when presented.  Exception: parent is signing for patient under 18."  (Complaint ¶21).

26.     In accordance with the instructions received from HA, Steven also provided HA and MyConsult with a copy of the power of attorney ("POA") he held as agent for his father, which had been signed by Alexander and notarized by Steven on December 11, 2011. (Complaint, ¶22).

27.     On December 15, 2014, Steven received an email from HA informing him it had received all the documents requested from Steven, that such documents were in order, and that HA would immediately commence the medical records collection process and forward Alexander's records to MyConsult promptly upon receiving them. (Complaint, ¶23).

28.     On December 23, 2014, MyConsult received the bulk of Alexander's Medical Records and on December 30, 2014, received a CD containing additional X-rays and CT scans. (Complaint, ¶24).

29.     On December 31, 2014, Alexander passed away from a gangrenous infection in his right leg that had developed after his initial admission to Aultman Hospital. Plaintiff's father was never taken off the respirator or designated as a DNR, and continued to receive "full-code" treatment, medication, testing, and nourishment until his death at 4:34 a.m. on the morning of December 31. (Complaint, ¶25).

30.     On January 2, 2015, Steven received an email from HA confirming Alexander's medical records had been forwarded to MyConsult, and informing Plaintiff that "MyConsult usually takes 10 to 14 business days to render a second opinion." (Complaint, ¶26). The email did not specify the precise date or dates on which Alexander's medical records had been sent to CCF, but in discovery CCF would acknowledge receiving them prior to Alexander's death.

31.     On or about February 25, 2015, Steven received an email from MyConsult seeking an update on Alexander's condition, to which Steven responded by email on that same

8

day, informing MyConsult of his father's passing. (Complaint, ¶29). The next day, February 26, 2015, at 5:29 p.m., MyConsult responded electronically to Steven's message that his father had died, by informing Steven that, as a result of Alexander's death, CCF would not render the SMO contracted for and was instead immediately "closing the file" on the matter. (Complaint, ¶31).

32.     Over the next few weeks, Steven made several unsuccessful attempts to contact MyConsult to discuss the situation with them, but was finally called by an in-house attorney for CCF on or about March 23, 2015. (Complaint, ¶¶32-34).

33.     Despite his father having succumbed, Steven informed the CCF lawyer that he still wanted the SMO because (i) he had already paid for it, (ii) the Cleveland Clinic was contractually obligated to provide it, and most importantly, (iii) the SMO would either reveal that (a) his father's diagnosis and/or prognosis were in error, or (b) the prognosis was correct, thus allowing Steven and his mother to gain some comfort and solace by having one of the most renowned health care organizations in the world re-affirm that nothing more could have been done, from a medical standpoint, to save his father. (Complaint, ¶36).

34.     On or about March 25, 2015, the CCF lawyer telephoned Steven again to inform him she had discussed the matter with the appropriate personnel at MyConsult, that CCF was still unwilling to render the SMO, and that, even though she had not formed a legal opinion as to whether a binding contract ever existed, such analysis was unnecessary and irrelevant as CCF "was just not going to do it [issue an SMO for Alexander] under any circumstances." (Complaint, ¶38). There were no further private discussions or contacts between the parties regarding this topic.

## PROCEDURAL HISTORY

35.     Plaintiff incorporates Paragraphs 1 through 34 above as if fully re-written and re-alleged herein.

36.     On September 2, 2015, Steven, solely in his own name and individual capacity, filed a civil lawsuit against CCF and one of its employees in Canton Municipal Court alleging several causes of action arising from the facts described above, including breach of contract, breach of fiduciary duty, negligent misrepresentation, and intentional and negligent infliction of emotional distress.

37.      On October 2, 2015, CCF and its employee filed their initial Answer with respect thereto. On or about November 9, 2015, Plaintiff filed a Motion to Voluntarily Dismiss, with prejudice, his claims for intentional and negligent infliction of emotional distress, which Motion was granted by the Canton Municipal Court  on November 9, 2015.

38.     Following the completion of discovery, and shortly before the trial was to commence, the Canton Municipal Court dismissed Steven's complaint, ***not on the merits***, but because "[a]s plaintiff's father is deceased, a cause of action should have been brought in the name of the executor or administrator of his father's estate," and that, as such, "plaintiff lacked standing to bring this action." [*See*, Judgment Entry of Judge Mary Falvey, dated May 18, 2016, *Steven A. Armatas v. Cleveland Clinic Foundation, et al.,* Canton Municipal Court; Case No. 2015 CVF 4368 (hereinafter, "CCF-I")].

39.     Steven then appealed the decision of the Canton Municipal Court in CCF-I to the Fifth District Court of Appeals, which affirmed the lower court's decision on October 11, 2016. [See, *Armatas v. Cleveland Clinic Foundation, et al*. 5th Dist. No. 2016-CA-00123, ¶¶40-48 (Oct. 11, 2016)].

40.     Following the dismissal of CCF-I by the Canton Municipal Court, Steven initiated and completed the process of being named the Executor of the Estate of Alexander E. Armatas (the "Alexander Estate") by Order of the Probate Court of Stark County, Ohio, dated December 15, 2016.

41.     On November 6, 2018, Steven A. Armatas, in his individual capacity, and the Alexander Estate, with Steven A. Armatas serving as Executor thereof, joined as co-Plaintiffs to re-file their Complaint against CCF, this time in the Stark County Court of Common Pleas (hereinafter, sometimes, "CCF-II"). Pursuant to Civ. R. 15(A), on November 13, 2018, Plaintiff filed an amendment to his original Complaint in the Underlying Litigation, as a matter of right, to add an exhibit, which had inadvertently been left off the original. On December 11, 2018, CCF filed its Answer to Plaintiff's Complaint.

42.     On or about June 21, 2019, Judge Hartnett, upon motion of CCF, entered an Order dismissing Steven A. Armatas, the individual, as a named plaintiff in the Underlying Litigation on the grounds Steven lacked proper standing to pursue the listed causes of action against CCF. Such Order had no bearing on the standing of the Alexander Estate as a putative plaintiff, nor did it affect the right of the Alexander Estate to continue pursuing such causes of action.

43.     Previously, on May 9, 2019, CCF had filed a separate motion for summary judgment seeking to have the claims of the Alexander Estate dismissed as well. On August 6, 2019, the Alexander Estate, as the sole remaining Plaintiff, filed its own motion for summary judgment against CCF solely on Count I of the Complaint (Breach of Contract).

44.     Following an exchange of numerous briefs and supplements thereto, on November 21, 2019, Judge Hartnett denied Plaintiff's summary judgment motion without discussion, but granted CCF's motion for summary judgment on the grounds that:

"Steven Armatas, in notarizing his own father's signature on a document in which Steven Armatas was a party and from which he could potentially gain financial benefit, was not a valid notarial act. Without a properly notarized signature, there is no power of attorney upon which the Estate can bring its claims against the CCF."

Judge Hartnett's Judgment Entry granting dismissal of the Underlying Litigation is attached hereto as **Exhibit # 2.**

45.     Judge Hartnett's actions nullify her judicial immunity protections, because at the time of her ruling, she had already dismissed Steven A. Armatas, the individual, as a party in the Underlying Litigation, thereby forfeiting personal jurisdiction over him, and leaving Steven A. Armatas, the individual, without any standing or right to respond to the personal accusations made against him.

46.     Judge Hartnett's actions also nullify her judicial immunity protections, because at the time of her ruling, she lacked the appropriate subject matter jurisdiction to consider the actions of a Notary Public within the State of Ohio, because all such authority had previously been delegated by the Ohio General Assembly to the Office of the Ohio Secretary of State.

47.     In that regard, Judge Hartnett, rather than appropriately considering a counterclaim or a cause of action asserted against Steven A. Armatas, the individual, took it upon herself to take an accusation contained in the Summary Judgment Motion submitted by CCF (i.e., that Steven A. Armatas, the individual, had improperly notarized a power of attorney signed by his father in 2011) and unilaterally transformed it into a "notarial complaint" against him, without any authority to do so **and** after having dismissed Mr. Armatas as a party from the case.

48.     Judge Hartnett had no jurisdiction to consider and opine upon such issue, because all matters and complaints regarding notarial conduct were exclusively delegated to the Office of

the Ohio Secretary of State by virtue of the Ohio Notary Modernization Act (the "New Notary

Act"),  which took effect on September 19, 2019.

49.     The New Notary Act (S.B. 263) consolidated all functions of commissioning,

overseeing, record-keeping, and disciplining notaries with the Office of the Ohio Secretary of

State. Under prior law, courts of common pleas and/or their clerks handled many of these

functions. These recording, oversight, and disciplinary procedures were codified in new R.C.

147.032, which took effect on September 20, 2019, a full two months *before* Judge Hartnett

handed down her Judgment Entry.

50.     New R.C. 147.032 reads in pertinent part:

(A)     (1) If the secretary of state believes that a violation of this chapter has
occurred, the secretary of state may investigate such violations.

(2) The secretary of state may investigate possible violations of this chapter upon
a signed complaint from any person.

(B) The secretary of state may hold a disciplinary hearing if the secretary of state
determines a hearing to be appropriate after an investigation conducted under
division (A) of this section.

51.     Therefore, Judge Hartnett had no subject matter jurisdiction over the issue when

she unilaterally assumed an oversight, investigative, and decision-making role regariding an

Ohio notary; a function the Ohio Legislature had removed from local county courts, and assigned

exclusively to the Office of the Ohio Secretary of State.

52.      Not only did Judge Hartnett lack personal jurisdiction over Steven A. Armatas,

the individual, and subject matter jurisdiction over any notarial activity he was involved with,

she committed legal error in dismissing Plaintiff's claims against CCF by (i) relying on a statute

that was not even in existence in 2011; (ii) wrongfully concluding that any applicable common

13

law had been codified into the New Notary Act;  and (iii) completely misconstruing the purpose and theory of the Ohio Power of Attorney Act.

## COUNT I

### The Civil Rights Act of 1871, 42 U.S.C. §1983
### Violation of Procedural Due Process Regarding Liberty Interest

53.     Plaintiff incorporates paragraphs 1 through 52 above as if fully re-alleged and re-written herein.

54.     The Civil Rights Act of 1871, Title 42, U.S.C. §1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

55.     Judge Hartnett, acting under color of state law, deprived Plaintiff of certain rights secured by the United States Constitution, including Plaintiff's right to be afforded procedural due process as guaranteed by the 14th Amendment, which reads in pertinent part: "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

56.     In this particular case, Steven A. Armatas, the individual, has a "liberty" interest in his reputation, which Judge Harnett damaged by (i) holding that Attorney Armatas' conduct

"in notarizing his own father's signature on a document…was not a valid notarial act;" and by (ii) not affording Mr. Armatas an opportunity to clear his name via a hearing or any other means.

57.     The United States Supreme Court has recognized a person's reputation is a protected liberty interest under the federal due process clause. *Wisconsin v. Constantineau*, 400 U.S. 433 (1971) (hereafter "*Constantineau*"); *Board of Regents v. Roth*, 408 U.S. 564 (1972) (hereafter "Roth"). In *Constantineau*, the State of Wisconsin authorized the posting of a notice prohibiting the sale or gift of liquor to any person who "'by excessive drinking' produces described conditions or exhibits specified traits, such as exposing himself or family 'to want' or becoming 'dangerous to the peace' of the community." On appeal, the *Constantineau* Court recognized that "[i]t would be naive not to recognize that such 'posting' or characterization of an individual will expose him to public embarrassment and ridicule." 400 U.S. at 436. The U.S. Supreme Court therefore held a protectible liberty interest is implicated "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him [or her.]" *Id.* at 437.

58.     As a direct and proximate result of Judge Hartnett's violations of the Civil Rights Act of 1871,Title 42, U.S.C. §1983, as described in this Count I, Plaintiff has lost business and incurred expenses in needing to defend his integrity in excess of $75,000.00, and seeks punitive damages to the extent the law will allow.  Plaintiff will seek leave of court to amend his Complaint to set forth the full amount of damages he has incurred when such amount is ascertained.

59.     Because the actions of Judge Hartnett demonstrate malice or aggravated or egregious conduct, and/or such Defendant knowingly authorized, participated in, or ratified

15

actions that were malicious or egregious, Plaintiff hereby seeks punitive and exemplary damages against Judge Hartnett to the maximum extent permitted by federal law.

## COUNT II

### The Civil Rights Act of 1871, 42 U.S.C. §1983
### Violation of the Equal Protection Clause

60.  Plaintiff incorporates paragraphs 1 through 59 above as if fully re-alleged and re-written herein.

61.  As referenced above, Judge Hartnett, acting under color of state law, deprived Plaintiff of certain rights secured by the Constitution, including Plaintiff's right to be afforded equal protection of the laws as guaranteed by the 14th Amendment, which reads in pertinent part: "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

62.  In this particular case, Steven A. Armatas, the individual, was denied equal protection of the laws because he was singled out by Judge Hartnett to have his notarial conduct questioned and ultimately deemed "invalid," by a common pleas court judge when all such reviews had been delegated exclusively to the Office of the Ohio Secretary of State.

63.   The United States Supreme Court has recognized the Equal Protection Clause protects "class[es] of one" from irrational government action. *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). Under ordinary rational-basis review, there is no motive inquiry; a plaintiff merely has "the burden... to negative 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Board of Trustees of Univ. of Ala. v. Garrett,* 531 U.S. 356, 367, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) (quoting *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)).

16

64.     Here, there was absolutely no rational basis for singling out Steven A. Armatas as the only Ohio Notary not to be referred to the Ohio Secretarry of State's Office for inquiry and to be denied a hearing regarding his alleged violation.

65.     As a direct and proximate result of Judge Hartnett's violations of Title 42, U.S.C. §1983 as described in this Count II, Plaintiff has lost business and incurred expenses in having to defend his integrity in excess of $75,000.00, and seeks punitive damages to the extent the law will allow.  Plaintiff will seek leave of court to amend his Complaint to set forth the full amount of damages he has incurred when such amount is ascertained.

66.     Because the actions of Judge Hartnett demonstrate malice or aggravated or egregious conduct, and/or such Defendant knowingly authorized, participated in, or ratified actions that were malicious or egregious, Plaintiff hereby seeks punitive and exemplary damages against Judge Hartnett to the maximum extent permitted by federal law.

## COUNT III

## Ohio Common Law Defamation

67.     Plaintiff incorporates paragraphs 1 through 66 above as if fully re-alleged and re-written herein.

68.     Because Judge Hartnett abused her discretion and acted outside her judicial authority, she forfeited any and all immunity typically afforded a sitting judge. As such, she bears the same responsibilities, duties and liabilities as a non-judicial officer or private citizen would in connection with any tortious acts committed upon Plaintiff. In that regard, she is liable for any defamatory statements regarding Attorney Armatas made in her individual capacity.

69.     The elements of a defamation claim under Ohio law require a private person who brings such a claim to plead and prove:  (1) a false and defamatory statement, (2) about the

plaintiff, (3) published without privilege to a third party, (4) with fault or at least negligence on the part of the defendant, and (5) that was either defamatory *per se* or caused special harm to the plaintiff.  See, *Thomas v. Cohr, Inc.*, 197 Ohio App.3d 145, 2011-Ohio-5916, 966 N.E.2d 915, ¶ 24 (1st Dist.)

70.     Ohio defines the term defamatory *per se* as any statement that "reflects upon the character of [the plaintiff] by bringing him into ridicule, hatred, or contempt, or affects him injuriously in his trade or profession." *Becker v. Toulmin*, 138 N.E.2d 391, 395 (Ohio 1956).

71.     In the matter at hand, Judge Hartnett was no longer serving in her capacity as a judge because she lacked both personal jurisdiction over Mr. Armatas and subject matter jurisdiction over his notarial acts. Therefore, she was effectively acting as a private citizen who falsely wrote in a publicly available document that M.r Steven Armatas' conduct "in notarizing his own father's signature on a document in which Steven Armatas was a party and from which he could potentially gain financial benefit, was not a valid notarial act."

72.     Such statement was either known to be false or resulted from Judge Hartnett's negligence in (i) relying upon a statute that was not even in existence in 2011; (ii) wrongfully concluding that any applicable common law had been codified into the New Notary Act; and (iii) completely misconstruing the purpose and theory of the Ohio Power of Attorney Act.

73.     Judge Hartnett's statement was defamatory *per se* because it "reflect[ed] upon the character of [the plaintiff] by bringing him into ridicule, hatred, or contempt, or affect[ed] him injuriously in his trade or profession," by costing him clients and money. As a direct and proximate result of Judge Hartnett's defamatory statements, Plaintiff has lost business and incurred expenses in having to defend his integrity in excess of $75,000.00, and seeks punitive damages to the extent the law will allow.

74.     Because the actions of Judge Hartnett demonstrated malice or aggravated or egregious conduct and/or such Defendant knowingly authorized, participated in, or ratified actions that were malicious or egregious, Plaintiff hereby seeks punitive and exemplary damages against Judge Hartnett to the maximum extent permitted by law.

## COUNT IV

## Ohio Common Law Interference with Business Relations

75.     Plaintiff incorporates paragraphs 1 through 74 above as if fully re-alleged and re-written herein.

76.     Because Judge Hartnett abused her discretion and acted outside her judicial authority, she forfeited any and all immunity typically afforded a sitting judge. As such, she bears the same responsibilities, duties and liabilities as any other citizen would in connection with committing any tortious acts upon another person. In that regard, she is accountable for any interference with Plaintiff's business relations and damages suffered as a result, including his ability to attract clients and earn money from representing them.

77.     Under Ohio law, the elements of a claim for tortious interference with a business relationship or contract are: (1) a business relationship or contract; (2) the defendant's knowledge of the relationship or contract; (3) the defendant's intentional or improper action taken to prevent a contract formation, procure a contractual breach, or terminate a business relationship; (4) a lack of privilege; and (5) resulting damages. *Byrne v. Univ. Hosps*., 8th Dist. Cuyahoga No. 95971, 2011-Ohio-4110, ¶ 28, citing *Castle Hill Holdings, L.L.C. v. Al Hut, Inc*., 8th Dist. Cuyahoga No. 86442, 2006-Ohio-1353, ¶ 46.

78.     Judge Hartnett's actions meet all such elements. Judge Hartnett clearly knew Steven A. Armatas was an attorney-at-law, and as an attorney herself with many friends and

colleagues engaged in private practice, knew or should have known that lawyers must attract and represent clients in order to earn a living, and that an attorney's reputation for honesty and integrity plays a significant role in such endeavor.

79.     Judge Hartnett knew or should have known that publicly finding a member of the bar "guilty" of any type of official misconduct, and suggesting, as in this case, that Steven A. Armatas had placed himself in a position to possibly take advantage of his own father, when such accusations were completely false, cast Plaintiff in a negative light and caused injury to his trade or profession.

80.     As a direct and proximate result of Judge Hartnett's public pronouncements, Plaintiff's reputation, character, trustworthiness and honesty was brought into question.  Not only was Attorney Armatas identified as someone who had committed an invalid notarial act, Judge Hartnett indicated he may have done so to possibly take advantage of his own father, an accusation that obviously reflected poorly upon his character and brought him into ridicule, hatred, or contempt. As a result, Plaintiff has lost substantial business and incurred expenses in having to defend his integrity, thereby suffering damages in excess of $75,000.00.

81.     Because the actions of Judge Hartnett demonstrated malice or aggravated or egregious conduct and/or such Defendant knowingly authorized, participated in, or ratified actions that were malicious or egregious, Plaintiff hereby seeks punitive and exemplary damages against Defendant to the maximum extent permitted by law.

## COUNT V

### Ohio Common Law Invasion of Privacy

82.     Plaintiff incorporates paragraphs 1 through 81 above as if fully re-alleged and re-written herein.

20

83.     Because Judge Hartnett abused her discretion and acted outside her judicial authority, she forfeited any and all immunity typically afforded a sitting judge. As such, she bears the same responsibilities, duties and liabilities as a non-judicial officer or a private citizen would in connection with any tortious conduct committed upon Plaintiff. In that regard, she is accountable for any actions related to and any damages resulting from an unwarranted invasion of Plaintiff's privacy.

84.     Under Ohio law, the elements of a claim for invasion of privacy differ somewhat depending upon whether the tortious conduct involves (1) the unwarranted appropriation or exploitation of one's personality; (2) the publicizing of one's private affairs with which the public has no legitimate concern; (3) the wrongful intrusion into one's private activities; and (4) false light invasion of privacy.

85.     In the case at bar, the one most applicable to Plaintiff is #2 above, more commonly known as the "Publication of Private Facts" cause of action. To establish the elements of such claim in Ohio, a plaintiff must allege: (1) publicity—communication to the public at large; (2) the facts disclosed really are private, and were not left open to the public eye; (3) the facts disclosed would be highly offensive to a reasonable person; (4) the disclosure was intentional; and (5) the facts publicized are not of a legitimate public concern. See, *Seta v. Reading Rock, Inc.*, 654 N.E.2d 1061, 1067 (Ohio Ct. App. 1995).

86.     The invasion of privacy claim asserted by Plaintiff meets all these criteria because (a) the communication at issue is a published opinion  made available on the Court of Common Pleas' website; (b) the facts disclosed concern the private business activities of a private citizen; (c) being accused of unethical professional conduct is highly offensive; (d) the disclosure by

Judge Hartnett was clearly intentional; and (e) the alleged incident is not of public concern because it affects no one other than the parties to the suit.

87. As an apt analogy, the Ohio Rules for the Governance of the Bar make it improper to intentionally publicize a disciplinary grievance made against a member of the bar until the Board of Governors find probable cause therein.   In this case, Judge Hartnett assigned herself the role of an investigative and disciplinary committee in what amounted to a grievance against a notary public brought by someone who had never used his services.

88. Judge Hartnett had no authority to rule on this subject matter. She also had no authority to conclude Steven A. Armatas, the individual, had committed an invalid notarial act after forfeiting all jurisdiction over Mr. Armatas by dismissing him as a party several months prior.

89. Even if Judge Hartnett had retained personal jurisdiction over Mr. Armatas, she afforded him no opportunity for a hearing before publicly declaring him to have violated his notarial duties. These actions support Plaintiff's claim that the "grievance" publicized by Defendant was private, and the publication thereof was offensive and objectionable.

90. As a result of Judge Hartnett's invasion of Plaintiff's privacy, Plaintiff has lost substantial business and incurred expenses in having to defend his integrity, thereby suffering damages in excess of $75,000.00.

91. Because the actions of Judge Hartnett demonstrated malice or aggravated or egregious conduct and/or such Defendant knowingly authorized, participated in, or ratified actions that were malicious or egregious, Plaintiff hereby seeks punitive and exemplary damages against Judge Hartnett to the maximum extent permitted by law.

## COUNT VI

### Action for Declaratory Judgment

92.    Plaintiff incorporates paragraphs 1 through 91 above as if fully re-alleged and re-written herein.

93.    Pursuant to 42 U.S.C. §1983, "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated, or declaratory relief was unavailable." See, *Yellen v. Hara*, No. CV 15-00300 JMS-KSC, 2015 WL 8664200 (D. Haw. Dec. 10, 2015).  In the present matter, declaratory relief is available and is hereby requested.

94.     This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 for the purpose of determining a question of actual controversy between the parties. Plaintiff seeks a declaration from this Honorable Court that the acts of Judge Hartnett were an unconstitutional exercise of her judicial authority and that her Judgment Entry of November 21, 2019 dismissing Plaintiff's case is thereby rendered null and void and of no force or effect.

95.    The Defendants' conduct through Judge Hartnett holding that Steven A. Armatas' engagement to notarize his own father's signature on a power of attorney "was not a valid notarial act" when she had previously relinquished personal jurisdiction over Mr. Armatas, and possessed no subject matter jurisdiction over matters of notarial conduct, constitute violations of Plaintiff's rights pursuant to the Fourteenth Amendment to the United States Constitution not to be deprived of Life, Liberty, or Property without due process of law, and to enjoy the equal protection of the laws of the State of Ohio.

96.    The Defendants' conduct through Judge Hartnett holding that Steven A. Armatas' engagement to notarize his own father's signature on a power of attorney "was not a valid

notarial act" was an unconstitutional exercise of judicial authority for the reasons mentioned above.

97.     Furthermore, Judge Hartnett's decision to dismiss Plaintiff's complaint based solely on her finding that Alexander's power of attorney was invalid renders Judge Hartnett's Judgment Entry of November 21, 2019 null and void and of no force or effect.

**WHEREFORE**, Plaintiff requests this Honorable Court to:

A.     Issue a declaratory judgment finding the Defendants' conduct in holding Steven A. Armatas' engagement to notarize his own father's signature on a power of attorney to be an invalid notarial act constituted an unconstitutional exercise of judicial authority for the reasons mentioned above, and that such judicial conduct has violated and continues to violate Mr. Armatas' rights pursuant to the Fourteenth Amendment to the Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

B.     Issue a declaratory judgment finding the Defendants' conduct in holding Steven A. Armatas' engagement to notarize his own father's signature on a power of attorney to be an invalid notarial act constituted an unconstitutional exercise of judicial authority for the reasons mentioned above, and therefore rendered Judge Hartnett's Judgment Entry of November 19, 2019 null and void and of no force or effect.

C.     Grant Plaintiff judgment on each of the remaining causes of action alleged herein for general and compensatory damages, in such amounts in excess of $75,000 as will be proven at trial, and further prays for an award of punitive damages, reasonable attorneys' fees and costs, together with such other and further relief as may be deemed just, equitable, and proper.

Respectfully submitted,

*/s/ Steven A. Armatas*

_____

Steven A. Armatas, Esq. (0025795)
7690 Bucknell Circle N.W.
North Canton, Ohio 44720
Telephone:   (330) 616-3040
Telefax:       (330) 966-8451
Email:          Starmatas@aol.com

*Counsel for Plaintiffs*